IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| FREDRICK BENARD MOSLEY, )<br>AIS #233819, )<br>)<br>   Plaintiff, )<br>)<br>v. )<br>)<br>)<br>SGT. DOMINIC JONES, *et al.*, )<br>)<br>   Defendants. ) | CASE NO. 2:13-CV-450-MHT<br>(WO) |

## **RECOMMENDATION OF THE MAGISTRATE JUDGE**

### I. INTRODUCTION

This 42 U.S.C. § 1983 action is before the court on a complaint filed by Fredrick Benard Mosley, a convicted state inmate at the time his claims arose, challenging the constitutionality of actions that occurred in 2013 during his confinement at the Easterling Correctional Facility ("Easterling"). On September 28, 2016, the District Court entered summary judgment in favor of the defendants on all of Mosley's claims except his individual capacity claims for excessive force against Dominic Jones and Larry Peavy and failure to protect against Christopher Scott, Timmy Adkinson, Kelvin Teal, and Marvin Scaife. Doc. 50. In accordance with this order and 28 U.S.C. § 636(b)(1)(B), the undersigned Magistrate Judge conducted an evidentiary hearing on November 3, 2016, during which the court received evidence and testimony regarding Mosley's excessive

1

force and failure-to-protect claims.[1] After considering all relevant testimony and exhibits admitted during the evidentiary hearing, the court recommends that a judgment be entered in favor of the defendants on all remaining causes of action.

## II. EVIDENTIARY HEARING

The evidentiary hearing proceeded on the following issues: (i) whether, on April 6, 2013, defendants Jones and Peavy subjected Mosley to an unprovoked and malicious use of force by choking him, forcefully ramming his head into a solid metal door, slapping him in the back of the head, hitting him in the chest with such force that he was gasping for air, placing a boot on his neck, kicking him in various areas of his body, and using a baton to apply pressure to his arms by leveraging his handcuffs; and (ii) whether defendants Scott, Adkinson, Teal, and Scaife observed any act of excessive force by Jones and Peavy but failed to protect Mosley from that use of force.

Mosley relied principally on his own testimony as evidentiary support for his claims. The defendants each provided testimony in opposition to Mosley's claims. In addition, Mayrena Junghans, the nurse who examined Mosley after the alleged assault, testified regarding the absence of any injuries to Mosley. Captain Nathaniel Lawson and Gwendolyn Babers, now a warden at Elmore Correctional Facility, testified regarding the internal investigation of Mosley's claims. The court admitted into evidence the affidavits of Teal (Pl. Exh. 1) and Adkinson (Pl. Exh. 2), photographs of Mosley taken by Teal immediately after the alleged use of force (Pl. Exh. 3), the medical body chart prepared by

---

[1] The parties did not file a jury demand.

Nurse Junghans upon her examination of Mosley (Pl. Exh. 4), and the Use of Force Investigative Report prepared pursuant to the internal investigation (Pl. Exh. 5). The undersigned closely observed the witnesses during their testimony and has undertaken a thorough review of the evidence presented by the parties during the evidentiary hearing.

Mosley testified that he took a bologna sandwich out of the dining hall at Easterling on April 6, 2013. Although he had received permission from Correctional Officer Bobby Lingo to obtain an extra sandwich from the kitchen staff, Mosley was not allowed to take that sandwich outside the dining hall because it would be considered contraband under institutional rules. Peavy and Jones confronted Mosley regarding his possession of the sandwich and escorted him to the shift office. Peavy, the supervising officer, determined that Mosley should be placed in Dorm C1, the restricted privileges dorm, for his violation of the institutional rule against possession of contraband.

Mosley testified that he repeatedly pleaded with Peavy and Jones, arguing that he "ain't did nothing, sir," and attempted to explain why he removed the sandwich from the dining hall. The officers nevertheless ordered Mosley to proceed to Dorm C1. Mosley initially complied with this order and they therefore deemed it unnecessary to place him in handcuffs during the walk to Dorm C1. However, as they approached the door to Dorm C1, Mosley repeatedly stated that he did not want to go into the dorm and with both hands grabbed a table outside the door of the dorm to impede the officers' efforts to place him inside. Despite repeated orders to enter Dorm C1, Mosley refused to release his hold on the table. Mosley initially testified that Jones then "grabs me by the neck choking me [and]

runs me all the way to . . . the side of the bench [located inside the door of Dorm C1]. [Officer Scott entered the dorm and] slammed me to the ground." On cross-examination, Mosley now denied that Scott slammed him to the ground and testified that Scott merely "pulled" him away from Jones. Mosley further testified that Peavy was "not touching" him while he was on the table, but was standing at the door to the dorm.

Peavy and Jones then placed Mosley in handcuffs and escorted him to Dorm B, the segregation dorm. According to Mosley's testimony, Peavy placed a baton under his handcuffs and repeatedly lifted up on his hands during the walk to Dorm B. During his direct testimony and on cross-examination, Mosley testified that Jones rammed his head into Dorm B's solid metal door as hard as Jones could "at least five or six times," then moved him into a secluded area in the dorm where Peavy placed his boot on Mosley's neck and at some point began "kicking [him] in the butt." Mosley testified that after the incident he had a white chalk-like substance on his forehead which he believed to have been transferred to him during the blows to his head on the painted metal door.

Mosley initially testified that, while they were in the secluded part of Dorm B, Peavy hit him in the back of the head multiple times and Jones repeatedly struck him in the chest with the palm of his hand. On cross-examination, defense counsel directed Mosley to his sworn complaint, in which he alleged that Jones struck him in the back of the head. *See* Doc. 1 at 10 ("Jones slap[ed] [me] in back of head about 26x time, [while] Larry Peavy [was] kicking my arm."). Mosley then testified that both Jones and Peavy struck him in

the back of the head. Finally, Mosley said that the use of force in the segregation room ended only when Teal arrived in the area and told Peavy and Jones, "That's enough."

Defendant Adkinson testified that he was assigned to provide security for the visitation yard on April 6, 2013. At approximately 2:00 p.m., upon the conclusion of visitation, Adkinson reported to the shift office and observed Jones and Peavy questioning Mosley with respect to an incident in the kitchen. Jones and Peavy instructed Adkinson "to go to the chow hall and . . . start counting," which he immediately did. Adkinson denied he placed Mosley in handcuffs and stated that he did not assist in escorting Mosley to Dorm C1. Adkinson also testified that he did not place his hands on Mosley nor did he witness any other correctional officer "use any type of force" against Mosley on that day.

Defendant Scott testified that he was conducting a count of inmates inside "2-side or B-side of the dorm," so he was not present when Jones and Peavy confronted Mosley and walked him to Dorm C1. When Scott concluded the count and walked to the entryway of Dorm C1, he saw Jones restraining Mosley by using his hands to hold Mosley's arm and shoulder. Jones advised Scott that he had the situation "under control," so Scott continued into the living area of the dorm to maintain security of the approximately one hundred inmates housed in that area. Scott further testified that he "did not pull [Mosley] to the ground" or at any time use force against Mosley, nor did he see any other correctional officer use unnecessary force against him. Specifically, Scott stated that he did not witness any officer choke, slap, punch, or kick Mosley, nor did he see any officer ram Mosley's head into a door.

Defendant Jones testified that he confronted Mosley after being told that Mosley took a bologna sandwich from the dining hall. Upon finding this sandwich in Mosley's possession, Jones took Mosley to the shift office to speak with the shift supervisor, Peavy. Defendant Peavy testified that he questioned Mosley, and ultimately decided Mosley should be placed in Dorm C1 for his violation of the rule prohibiting possession of contraband. As stated above, Mosley initially complied with the order regarding his transfer to C1, so Jones and Peavy escorted Mosley to C1 without handcuffing him. Upon reaching the door to C1, however, Jones and Peavy testified that Mosley grabbed a table directly outside the dorm with both of his hands and repeatedly said that he did not want to go into C1. Jones testified that he ordered Mosley to release his hold on the table, but Mosley refused. Jones and Peavy both testified that they considered Mosley's actions to be a failure to obey direct orders given to him. They proceeded to break Mosley's grip on the table, with each officer grabbing one of Mosley's hands and removing it from the table.

Once Mosley released his hold on the table, Jones and Peavy took him into Dorm C1. Jones and Peavy testified that as they entered the dorm Mosley grabbed Jones' arm and swung his fist at him. Mosley did not land the punch. Each officer grabbed one of Mosley's arms and placed him up against the wall in an effort to regain control of the situation, while Mosley continued to struggle against them. When Scott approached the area, Jones testified that he advised Scott that the situation was already under control. Both Peavy and Jones testified that they used only the amount of force necessary to restrain Mosley and gain control of the situation in a volatile environment. Mosley was placed in

handcuffs and escorted to Dorm B for placement in segregation. Jones testified that all use of force ceased once they placed handcuffs on Mosley.

During their testimony, Peavy and Jones denied any use of force against Mosley during the walk to Dorm B or while in this dorm. They further testified that at no time did Peavy use a baton in leveraging Mosley's handcuffs nor did Jones ram Mosley's head into the solid metal door of Dorm B. The officers further testified that they did not at any time choke, slap, kick, hit, or punch Mosley, and did not witness any similar use of force by another officer.

In his testimony, Defendant Teal advised that Mosley arrived at the segregation unit for processing at approximately 2:15 p.m. At this time, Teal took photographs of Mosley against the wall of the dorm's lobby. Teal testified that he did not observe Jones and Peavy strike Mosley on the back of his head or hit him in the chest. Teal likewise stated that at no time did he see these officers choke, slap, punch, or kick Mosley. Defendant Scaife, the segregation cubicle officer on the date of the incident, also testified that he did not witness any improper use of force against Mosley. Jones testified that after Mosley had been processed into the segregation unit, another correctional officer escorted Mosley to the health care unit for a medical evaluation.

Mosley arrived at the health care unit at approximately 2:35 p.m. according to Nurse Mayrena Junghans. *See* Pl. Exh. 4. Nurse Junghans conducted the examination of him and observed no injuries to any area of his body, but did note a white substance on his forehead. Pl. Exh. 4. Nurse Junghans testified that her assessment of Mosley was as follows: "Alert

and oriented times three. Skin warm and dry. Times two white areas noted to left side of forehead. No redness or bruises noted. Denies injuries. Blood pressure checks ordered due to increased blood pressure[.]" *See* Pl. Exh. 4. Nurse Junghans further testified that she observed no burns, knots, or anything that could be considered an injury to Mosley's body, and advised that any visible injury "would have been noted on the body chart." With respect to the white areas on his forehead, Nurse Junghans testified that these areas did not show any indication of an injury because there was no bruising or swelling in those areas. Nurse Junghans further testified that "Mosley was not hurt in any way," and had no injuries consistent with having his head rammed into a metal door several times or being struck, kicked, and punched. Based on her observations, Nurse Junghans determined that that Mosley did not need any treatment and released him for placement in his assigned dorm.

### III. DISCUSSION

    *A.*     ***Excessive Force Standard***

Claims of excessive force by prison officials against convicted inmates are governed by the Eighth Amendment's proscription against cruel and unusual punishment. *Campbell v. Sikes*, 169 F.3d 1353, 1374 (11th Cir. 1999). The standard applied to an Eighth Amendment excessive force claim contains both a subjective and objective component. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). The subjective component requires that prison "officials act[ed] with a sufficiently culpable state of mind." *Id.* at 8 (internal quotations omitted). With respect to the objective component, a plaintiff must show that "the alleged wrongdoing was objectively harmful enough to establish a constitutional violation." *Id*. In

8

addition, "the use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury." *Id*. at 4.

> Under the Eighth Amendment, force is deemed legitimate in a custodial setting as long as it is applied "in a good faith effort to maintain or restore discipline [and not] maliciously and sadistically to cause harm." To determine if an application of force was applied maliciously and sadistically to cause harm, a variety of factors are considered including: "the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." From consideration of such factors, "inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur."

*Skrtich v. Thornton*, 280 F.3d 1295, 1300–01 (11th Cir. 2002) (citations omitted). "Moreover, an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held personally liable for his nonfeasance." *Id*. at 1301.

In *Hudson v. McMillian*, the Supreme Court held that the use of excessive physical force against a prisoner may constitute cruel and unusual punishment even though the prisoner does not suffer serious injuries. *Hudson*, 503 U.S. at 9. Whether a defendant's use of force is excessive—and thus violates an inmate's right to be free from cruel and unusual punishment—"depends on whether the [defendant's] act shocks the conscience." *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007). An excessive force claim "necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not a sort 'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S. at 9–10 (quoting *Whitley v. Albers*, 475 U.S. 312, 327 (1986)); *Brooks v. Kyler*, 204 F.3d

9

102, 103 (3rd Cir. 2000) (holding that there is "no fixed minimum quantity of injury that a prisoner must prove that he suffered" in order to present an excessive force claim).

Notwithstanding the fact that a *de minimis* use of force will rarely suffice to state a constitutional claim, a plaintiff is not required to show that the application of force resulted in serious injury. *Hudson*, 503 U.S. at 8. Rather, the key inquiry under *Hudson* is whether the alleged conduct involved "unnecessary and wanton infliction of pain." *Id*. The Supreme Court recently emphasized that its holding in *Hudson* does not mandate that a "certain quantum of injury" must be sustained, but instead stands for the proposition that the core constitutional question is "'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting *Hudson*, 503 U.S. at 9).

### B.     *Evidentiary Analysis*

After listening to each of the witnesses and duly considering all of the evidence, the court finds that Mosley's testimony regarding the material events in dispute was not credible in as much as it could not be squared with the medical evidence and was at times inconsistent with his prior testimony and sworn complaint. On the other hand, the court finds the testimony of the defendants to be credible and consistent with the medical and other evidence. In reaching this conclusion, the court has weighed the testimony of all the witnesses, taking into account the interests of the witnesses, the consistencies or inconsistencies in their testimonies, and their demeanor on the stand—and puts no stock in

the status of the witnesses. *See Gallage v. United States*, 174 F.3d 1196, 1198 (11th Cir. 1999).

Most significantly, there is no corroboration of Mosley's account of being choked, kicked repeatedly, struck in the chest, beaten about the head, and rammed several times head first into a solid metal door.  In fact, Nurse Junghans' medical examination, which was conducted within an hour of the alleged use of force, demonstrated that Mosley exhibited absolutely no injuries, needed no treatment, and could be released immediately to return to the facility. Pl. Exh. 4.  Such a clean bill of health thoroughly undercuts Mosley's account of a savage beating at the hands of Jones and Peavy only a short time before.  If nothing else, Nurse Junghans should have been able to see significant evidence of bruising and swelling on Mosley's head if Jones had, in fact, repeatedly rammed it into a solid metal door.  Instead she noted no bruising or any other indication of injury.  Teal's photographs of Mosley also show no signs of head trauma. *See* Pl. Exh. 3.[2]  What is more, Mosley himself disclaimed any injuries at that time. Pl. Exh. 4 ("Denies injuries.").  The court credits Nurse Junghans' testimony and Mosley's own disclaimer of any injury immediately after the altercation—and long before his lawsuit.

Moreover, certain aspects of Mosley's testimony during the evidentiary hearing conflicted with his sworn complaint, casting further doubt on his account of the force used

---

[2] Both Nurse Junghans' examination and the photographs reflect small blotches of a white substance of unknown origin on Mosley's forehead.  Mosley testified that this substance was dirt or paint transferred to his head when Jones rammed him into the door.  To find this testimony credible, the court would have to accept the proposition that Jones somehow "rammed" Mosley into the door with so little force that the impact did not create bruising, swelling, or bleeding to his head.

11

against him.  For example, Mosley testified during the hearing that Peavy merely stood by as Jones attempted to pull him off the table near the door to Dorm C1.  In his complaint, however, he alleged that "Larry Peavy pull[ed] my left arm off [the] table." Doc. 1 at 10.  In another instance, Mosley testified that Peavy placed a baton under his handcuffs and repeatedly lifted up on his hands while they walked from Dorm C1 to Dorm B.  In his complaint, Mosley swore that this episode occurred only after they arrived in the "segregation room" inside Dorm B. Doc. 1 at 11.  Mosley's account of the altercation in the segregation room evolved as well, as his complaint stated that "Jones slap[ed] [me] in back of head about 26x time, [while] Larry Peavy . . . [was] kicking my arm," *see* Doc. 1 at 10; his testimony on direct examination had Peavy hitting him in the head and Jones striking him in the chest; and his testimony on cross-examination—after having been confronted with this inconsistency—was now that both officers hit him in the head.  While these deviations call into doubt the veracity of Mosley's testimony before the court, no such inconsistencies plagued the testimony of the defendants, who each corroborated the other accounts of their interactions with Mosley on April 6, 2013.

In summation, the court does not find to be credible or corroborated by credible evidence Mosley's allegations that Jones and Peavy, acting wholly without provocation or any lawful purpose, sadistically and maliciously subjected him to a use of excessive force.  Nor is it credible that Scott, Adkinson, Teal, and Scaife observed any act of excessive force and failed to protect Mosley from the use of such force.

## IV. CONCLUSION

In sum, the credible evidence supports the testimony of defendants Jones and Peavy that they used only the amount of force necessary to gain and maintain control of Mosley, and that they did not choke, hit, slap, punch, or kick him—or repeatedly ram his head into a solid metal door.  The credible evidence likewise supports the testimony of defendants Scott, Adkinson, Teal and Scaife that they did not witness any use of excessive force against Mosley.  The court readily concludes that the record does not establish any constitutionally impermissible use of force by Jones and Peavy such that Scott, Adkinson, Teal, and Scaife should have intervened on behalf of Mosley.  Consequently, judgement is due to be granted in favor of the defendants.

Accordingly, based on the evidentiary record, it is the RECOMMENDATION of the Magistrate Judge that:

1. Judgment be entered in favor of the defendants and against the plaintiff.
2. This case be DISMISSED with prejudice.
3. Costs be taxed against the plaintiff for which execution my issue.

It is further ORDERED that on or before **November 30, 2016** the parties may file objections to this recommendation.  A party must specifically identify the factual findings and legal conclusions in the recommendation to which the objection is made; frivolous, conclusive, or general objections will not be considered.  Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar a party from a *de novo* determination by the District Court of factual findings and legal issues

covered in the report and shall "waive the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11th Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

     DONE this 16th day of November, 2016.

                                        /s/ Gray M. Borden
                            UNITED STATES MAGISTRATE JUDGE